1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MICHAEL PLUNKETT,

11          Petitioner,            No. CIV S-08-0907 GEB DAD P

12      vs.

13   D. K. SISTO, et al.,

14          Respondents.          FINDINGS & RECOMMENDATIONS

15   _____/

16          Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges the decision of the California Board

18   of Parole Hearings (hereinafter "Board") to deny him parole for one year at his fourth subsequent

19   parole consideration hearing held on May 1, 2007.  Upon careful consideration of the record and

20   the applicable law, the undersigned will recommend that petitioner's application for habeas

21   corpus relief be denied.

22              PROCEDURAL BACKGROUND

23          Petitioner is confined pursuant to a judgment of conviction entered in the Butte

24   County Superior Court in 1991.  (Pet. at 1.)  In that case petitioner pled nolo contendere to

25   second degree murder with use of a firearm.  (Id.)  Pursuant to his plea, on February 7, 1991,

26   petitioner was sentenced to sixteen years to life in state prison.  (Id.)

1

1          Petitioner's initial parole consideration hearing, held on January 14, 1999,

2    resulted in a two-year denial of parole.  (Pet. at 4 of 68.)  Petitioner's next parole consideration

3    hearing was held on January 29, 2002.  (Id.)  On that date, petitioner was found not suitable for

4    release on parole and denied parole for one year.  (Id.)  Petitioner's third parole consideration

5    hearing was held on February 4, 2003, at which time he was again found unsuitable for release

6    and denied parole for one year.  (Id.)  Petitioner's fourth subsequent parole consideration hearing,

7    which is placed at issue in the instant petition, was held on May 1, 2007.  (Answer, Ex. 1at Ex.

8    A) (hereinafter "Decision").  A panel of the Board found petitioner not suitable for parole and

9    denied parole for one year.  (Decision at 81.)  At the time of this latest parole denial, petitioner

10   had served two years past his minimum sentence of sixteen years in prison.  (Pet. at 21 of 68.)

11          Petitioner challenged the Board's May 1, 2007 decision in a petition for a writ of

12   habeas corpus filed in the Butte County Superior Court on October 9, 2007.  (Answer, Ex. 1.)

13   The Superior Court rejected petitioner's claims for the following reasons:

14              The vague, unsupported, and conclusory allegations contained in
                the Petition are insufficient to allow for intelligent consideration of
15              the issues which petitioner had attempted to raise.  (In re: Swain
                (1949) 34 Cal.2D 300; In re Patton 1918) 178 Cal.629).
16
17              Petitioner has failed to establish a prima facie case for relief on
                habeas corpus (In re Lawler 23 Cal.3rd 190, 194).

18   (Answer, Ex. 2.)  On October 30, 2007, petitioner filed a  petition for writ of habeas corpus in the

19   California Court of Appeal for the Third Appellate District.  (Answer, Ex. 3.)  That petition was

20   summarily denied by order dated December 13, 2007.  (Answer, Ex. 4.)  Petitioner subsequently

21   filed a petition for review in the California Supreme Court, which was summarily denied by

22   order dated February 27, 2008.  (Answer, Exs. 5, 6.)

23                              FACTUAL BACKGROUND

24          The Board described the facts of petitioner's commitment offense, which have not

25   changed over the years, at the May 1, 2007 parole suitability hearing, as follows:

26   /////

                                        2

June 11th, 1989, an on-duty police officer observed a white van approaching him on Bird Street in Oroville, driving with its parking lights on.  The officer flashed his lights at the vehicle to signal the driver to turn on his lights.  The driver of the van did not turn on the lights, so the officer made a U-turn and began to follow the van in order to make a traffic stop.  When the officer activated his overhead light, the van accelerated and ran a red light."

The officer made a turn to intercept the van and subsequently located the van in the 2000 block of High Street in Oroville.  The van had been driven up onto the curb.  The driver's door was open, but the officer did not observe any subjects in sight.  The officer approached the van and inside found the body of a male adult.  The officer called for backup and an ambulance and secured the scene.

When medical personnel arrived at the scene, they determined that the person in the van was deceased as a result of a gunshot wound in the back.  The victim was later identified as Peter Macias, —A-C-I-A-S, age 19.  According to the coroner's report, Peter Macias died of a shotgun wound to the upper – to the right upper back and chest.  The autopsy report indicated additional trauma to the body, some beating and maltreatment prior to death.

An investigation commenced and officers began to search the area for the driver of the van.  An officer was approached by a man who told him that two subjects, Michael Plunkett, P-L-U-N-K-E-T-T, and Donald Ferraro, F-E-R-R-A-R-O, had earlier in the day forced their way into an apartment on Montgomery Street and forcibly removed the victim Peter Macias.  The witness stated that the two men had been armed with a shotgun and that they had beaten Macias prior to removing him from the apartment.

Further information indicated that Ferraro and Plunkett were involved with another subject by the name of Roger Hunter, who drove a white van similar to the one in which the body was found.  A number of witnesses were interviewed and information was gathered indicating that Peter Macias, along with another male subject that had – another male subject had previously stolen a quarter of a pound of marijuana from Michael Plunkett.  There were several reports, including one to a police officer, that Peter Macias had stated that Plunkett was going to kill him over a 500 dollar drug debt.

Information was received from witnesses indicating that Plunkett, Ferraro, and Hunter had been associating with each other for the last two weeks and had been living in the Oroville area in an apartment rented by Michael Plunkett near where the van was abandoned on High Street.  During the search of the area, police found a fire escape that led to an open window of an apartment near where the van was abandoned.  Evidence found in the

3

1

apartment indicated that it had been rented by Michael Plunkett
and that he had previously lived there.

2

3

After a complete investigation of the case, warrants were issued for
Donald Ferraro, Roger Hunter, and Michael Plunkett on charges of
kidnapping and murder.  On October 23rd, 1990, Plunkett, Hunter,
and Ferraro each pled guilty to one count of second degree murder.
Ferraro pled guilty to being personally armed during the offense
and Plunkett and Hunter pled to being involved where a principal
was armed.

4

5

6

7

(Decision at 12-15.)

8

ANALYSIS

9

I.  Standards of Review Applicable to Habeas Corpus Claims

10

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

11

some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

12

861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

13

Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the

14

interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

15

Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas

16

corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377

17

(1972).

18

This action is governed by the Antiterrorism and Effective Death Penalty Act of

19

1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d

20

1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

21

habeas corpus relief:

22

An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court shall
not be granted with respect to any claim that was adjudicated on
the merits in State court proceedings unless the adjudication of the
claim -

23

24

25

(1) resulted in a decision that was contrary to, or involved
an unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

26

4

1
 (2) resulted in a decision that was based on an unreasonable
 determination of the facts in light of the evidence presented in the
2
 State court proceeding.

3 See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362

4 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision

5 does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review

6 of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See

7 also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

8 we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such

9 error, we must decide the habeas petition by considering de novo the constitutional issues

10 raised.").

11
 The court looks to the last reasoned state court decision as the basis for the state

12 court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned

13 state court decision adopts or substantially incorporates the reasoning from a previous state court

14 decision, this court may consider both decisions to ascertain the reasoning of the last decision.

15 Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court

16 reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

17 habeas court independently reviews the record to determine whether habeas corpus relief is

18 available under § 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v.

19 Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not reached

20 the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's

21 deferential standard does not apply and a federal habeas court must review the claim de novo.

22 Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

23 II.  Petitioner's Claim

24
 Petitioner claims that the Board's failure to find him suitable for parole at his May

25 1, 2007, parole suitability hearing violated his right to due process.  (Pet., at 5 & 7 of 68.)  He

26 argues that the Board "failed to properly consider petitioners exemplary post conviction behavior,

1  positive prison programming and favorable psychological evaluations as proof of his

2  rehabilitation and suitability for parole." (Id. at 5.)  Petitioner notes, among other things, that he

3  had no prior criminal history and that his only prison disciplinary proceeding involved the

4  infraction of "receiving a tattoo." (Id. at 4, 5.)  Petitioner also argues that the Board failed to

5  comply with relevant state law and regulations, and used "arbitrary and capricious standards" in

6  finding him unsuitable for parole. (Id. at 7.)

7           A.  Due Process in the California Parole Context

8           The Due Process Clause of the Fourteenth Amendment prohibits state action that

9  deprives a person of life, liberty, or property without due process of law.  One alleging a due

10  process violation must first demonstrate that he was deprived of a liberty or property interest

11  protected by the Due Process Clause and then show that the procedures attendant upon the

12  deprivation were not constitutionally sufficient. Ky. Dep't of Corr. v. Thompson, 490 U.S. 454,

13  459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002) (McQuillion I).

14           A protected liberty interest may arise from either the Due Process Clause of the

15  United States Constitution or state laws. Bd. of Pardons v. Allen, 482 U.S. 369, 373 (1987).  The

16  United States Constitution does not, of its own force, create a protected liberty interest in a parole

17  date, even one that has been set. Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  However, "a

18  state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release

19  will be granted' when or unless certain designated findings are made, and thereby gives rise to a

20  constitutional liberty interest." McQuillion I, 306 F.3d at 901 (quoting Greenholtz v. Inmates of

21  Neb. Penal, 442 U.S. 1, 12 (1979)).

22           California's parole scheme gives rise to a cognizable liberty interest in release on

23  parole, even for prisoners who have not already been granted a parole date. Sass v. Cal. Bd. of

24  Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th

25  Cir. 2003); McQuillion I, 306 F.3d at 903; see also In re Lawrence, 44  Cal. 4th 1181, 1204,

26  1210, 1221 (2008).  Accordingly, this court must examine whether California provided the

6

1  constitutionally-required procedural safeguards when depriving petitioner of a protected liberty

2  interest and, if not, whether the state courts' conclusion that it did was contrary to or an

3  unreasonable application of clearly established federal law.

4          In this regard, it is clearly established federal law that a parole board's decision

5  deprives a prisoner of due process with respect to his constitutionally protected liberty interest in

6  a parole release date if the Board's decision is not supported by "some evidence in the record."

7  Superintendent v. Hill, 472 U.S. 445, 457 (1985); Irons v. Carey, 505 F.3d 846, 851 (9th Cir.

8  2007); Sass, 461 F.3d at 1128; Biggs, 334 F.3d at 915.  "The 'some evidence' standard is

9  minimally stringent," and a decision will be upheld under that standard if there is any evidence in

10  the record that could support the conclusion reached by the factfinder.  Powell v. Gomez, 33 F.3d

11  39, 40 (9th Cir. 1994) (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987)).  See also

12  Toussaint v. McCarthy, 801 F.2d 1080, 1105 (9th Cir. 1986).  However, "the evidence

13  underlying the board's decision must have some indicia of reliability."  Jancsek v. Or. Bd. of

14  Parole, 833 F.2d 1389, 1390 (9th Cir. 1987).  See also Perveler v. Estelle, 974 F.2d 1132, 1134

15  (9th Cir. 1992).  Determining whether the "some evidence" standard is satisfied does not require

16  examination of the entire record, independent assessment of the credibility of witnesses, or the

17  weighing of evidence.  Toussaint, 801 F.2d at 1105.  The question is whether there is any reliable

18  evidence in the record that could support the conclusion reached.  Id.

19          When assessing whether a state parole board's suitability decision was supported

20  by "some evidence," the analysis "is framed by the statutes and regulations governing parole

21  suitability determinations in the relevant state."  Irons, 505 F.3d at 851.   Therefore, this court

22  must:

23          look to California law to determine the findings that are necessary
            to deem a prisoner unsuitable for parole, and then must review the
24          record in order to determine whether the state court decision
            holding that these findings were supported by "some evidence" in
25          [petitioner's] case constituted an unreasonable application of the
            "some evidence" principle articulated in Hill.

26  /////

7

1   (Id.)

2          Under California law, prisoners serving indeterminate prison sentences "may

3   serve up to life in prison, but they become eligible for parole consideration after serving

4   minimum terms of confinement."   In re Dannenberg, 34 Cal. 4th 1061, 1078 (2005).  The Board

5   normally sets a parole release date one year prior to the inmate's minimum eligible parole release

6   date, and does so "in a manner that will provide uniform terms for offenses of similar gravity and

7   magnitude in respect to their threat to the public."   In re Lawrence, 44 Cal. 4th at 1202 (citing

8   California Penal Code § 3041(a)).  A release date must be set "unless [the Board] determines that

9   the gravity of the current convicted offense or offenses, or the timing and gravity of current or

10  past convicted offense or offenses, is such that consideration of the public safety requires a more

11  lengthy period of incarceration . . . and that a parole date, therefore, cannot be fixed . . . ."  Cal.

12  Penal Code § 3041(b).

13         In order to carry out the mandate of § 3041, the Board must determine "whether

14  the inmate poses 'an unreasonable risk of danger to society if released from prison,' and thus

15  whether he or she is suitable for parole."   In re Lawrence, 44 Cal. 4th at 1202 (citing California

16  Code Regs., tit. 15, § 2281(a)).  In doing so, the Board must consider all relevant, reliable

17  information available regarding

18            the circumstances of the prisoner's social history; past and present
              mental state; past criminal history, including involvement in other
19            criminal misconduct which is reliably documented; the base and
              other commitment offenses, including behavior before, during and
20            after the crime; past and present attitude toward the crime; any
              conditions of treatment or control, including the use of special
21            conditions under which the prisoner may safely be released to the
              community; and any other information which bears on the
22            prisoner's suitability for release.

23
    Cal. Code Regs., tit. 15, § 2281(b).
24
           The regulation identifies circumstances that tend to show suitability or
25
    unsuitability for release.  Cal. Code Regs., tit. 15, § 2281(c) & (d).  The following circumstances
26

                                                8

have been identified as tending to show that a prisoner is suitable for release: (1) the prisoner has

no juvenile record of assaulting others or committing crimes with a potential of personal harm to

victims; (2) the prisoner has experienced reasonably stable relationships with others; (3) the

prisoner has performed acts that tend to indicate the presence of remorse or has given indications

that he understands the nature and magnitude of his offense; (4) the prisoner committed his crime

as the result of significant stress in his life; (5) the prisoner's criminal behavior resulted from

having been victimized by battered women syndrome; (6) the prisoner lacks a significant history

of violent crime; (7) the prisoner's present age reduces the probability of recidivism; (8) the

prisoner has made realistic plans for release or has developed marketable skills that can be put to

use upon release; and (9) institutional activities indicate an enhanced ability to function within

the law upon release.  Cal. Code Regs., tit. 15, § 2281(d).

       The following circumstances have been identified as tending to indicate

unsuitability for release: (1) the prisoner committed the offense in an especially heinous,

atrocious, or cruel manner; (2) the prisoner had a previous record of violence; (3) the prisoner has

an unstable social history; (4) the prisoner's crime was a sadistic sexual offense; (5) the prisoner

had a lengthy history of severe mental problems related to the offense; and (6) the prisoner has

engaged in serious misconduct in prison.  Cal. Code Regs., tit. 15, § 2281(c).  Factors to consider

in deciding whether the prisoner's offense was committed in an especially heinous, atrocious, or

cruel manner include: (A) multiple victims were attacked, injured, or killed in the same or

separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such

as an execution-style murder; (C) the victim was abused, defiled or mutilated during or after the

offense; (D) the offense was carried out in a manner that demonstrated an exceptionally callous

disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in

relation to the offense.  Id. § 2281(c)(1)(A) - (E).

       The overriding concern in determining parole suitability is public safety.

Dannenberg, 34 Cal. 4th at 1086.  This "core determination of 'public safety'. . . involves an

assessment of an inmates <u>current</u> dangerousness." <u>Lawrence</u>, 44 Cal. 4th at 1205 (emphasis in original). <u>See also</u> Cal. Code Regs. tit. 15, § 2281(a) ("Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.") Accordingly, under California law,

> when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings.

<u>Lawrence</u>, 44 Cal. 4th at 1212 (citing <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 658 (2002); <u>Dannenberg</u>, 34 Cal. 4th at 1071; and <u>In re Lee</u>, 143 Cal. App. 4th 1400, 1408 (2006)).

        In recent years the Ninth Circuit Court of Appeals has concluded that, given the liberty interest that California prisoners have in their release on parole, a continued reliance upon an unchanging factor to support a finding of unsuitability for parole may, over time, constitute a violation of due process. The court has addressed the issue in three significant cases, each of which will be discussed below.

        First, in <u>Biggs</u>, the Ninth Circuit Court of Appeals recognized that a continued reliance on an unchanging factor to deny parole, such as the circumstances of the offense, could at some point result in a due process violation.[1] While the court in <u>Biggs</u> rejected several of the reasons given by the Board for finding the petitioner in that case unsuitable for parole, it upheld three: (1) petitioner's commitment offense involved the murder of a witness; (2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; and (3) petitioner could benefit from therapy. <u>Biggs</u>, 334 F.3d at 913. However, the court in <u>Biggs</u> also cautioned that continued reliance solely upon the gravity of the offense of conviction and petitioner's conduct prior to committing that offense in denying parole could, at some point,

---

        [1] That holding has been acknowledged as representing the law of the circuit. <u>Irons</u>, 505 F.3d at 853; <u>Sass</u>, 461 F.3d at 1129.

1   violate due process.  In this regard, the court observed:

2           As in the present instance, the parole board's sole supportable
            reliance on the gravity of the offense and conduct prior to
3           imprisonment to justify denial of parole can be initially justified as
            fulfilling the requirements set forth by state law.  Over time,
4           however, should Biggs continue to demonstrate exemplary
            behavior and evidence of rehabilitation, denying him a parole date
5           simply because of the nature of Biggs' offense and prior conduct
            would raise serious questions involving his liberty interest in
6           parole.

7   Id. at 916.  The court in Biggs also stated that "[a] continued reliance in the future on an

8   unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

9   contrary to the rehabilitative goals espoused by the prison system and could result in a due

10  process violation."  Biggs. 334 F.3d at 917.

11          In Sass, the Board found the petitioner unsuitable for parole at his third suitability

12  hearing based on the gravity of his offenses of conviction in combination with his prior offenses.

13  461 F.3d at 1126.  Citing Biggs, the petitioner in Sass contended that reliance on these

14  unchanging factors violated due process.  The court disagreed, concluding that these factors

15  amounted to "some evidence" to support the Board's determination.  Id. at 1129.  The court

16  provided the following explanation for its holding:

17          While upholding an unsuitability determination based on these
            same factors, we previously acknowledged that "continued reliance
18          in the future on an unchanging factor, the circumstance of the
            offense and conduct prior to imprisonment, runs contrary to the
19          rehabilitative goals espoused by the prison system and *could* result
            in a due process violation."  Biggs, 334 F.3d at 917 (emphasis
20          added).  Under AEDPA it is not our function to speculate about
            how future parole hearings could proceed.  Cf. id.  The evidence of
21          Sass' prior offenses and the gravity of his convicted offenses
            constitute some evidence to support the Board's decision.
22          Consequently, the state court decisions upholding the denials were
            neither contrary to, nor did they involve an unreasonable
23          application of, clearly established Federal law as determined by the
            Supreme Court of the United States.  28 U.S.C. § 2254(d).

24

25  Id.

26  /////

                                        11

1    In Irons, the Ninth Circuit sought to harmonize the holdings in Biggs and Sass, stating as

2    follows:

3              Because the murder Sass committed was less callous and cruel than
               the one committed by Irons, and because Sass was likewise denied
4              parole in spite of exemplary conduct in prison and evidence of
               rehabilitation, our decision in Sass precludes us from accepting
5              Irons' due process argument or otherwise affirming the district
               court's grant of relief.

6
               We note that in all the cases in which we have held that a parole
7              board's decision to deem a prisoner unsuitable for parole solely on
               the basis of his commitment offense comports with due process,
8              the decision was made before the inmate had served the minimum
               number of years required by his sentence.  Specifically, in Biggs,
9              Sass, and here, the petitioners had not served the minimum number
               of years to which they had been sentenced at the time of the
10             challenged parole denial by the Board.  Biggs, 334 F.3d at 912;
               Sass, 461 F.3d at 1125.  All we held in those cases and all we hold
11             today, therefore, is that, given the particular circumstances of the
               offenses in these cases, due process was not violated when these
12             prisoners were deemed unsuitable for parole prior to the expiration
               of their minimum terms.

13
               Furthermore, we note that in Sass and in the case before us there
14             was substantial evidence in the record demonstrating rehabilitation.
               In both cases, the California Board of Prison Terms appeared to
15             give little or no weight to this evidence in reaching its conclusion
               that Sass and Irons presently constituted a danger to society and
16             thus were unsuitable for parole.  We hope that the Board will come
               to recognize that in some cases, indefinite detention based solely
17             on an inmate's commitment offense, regardless of the extent of his
               rehabilitation, will at some point violate due process, given the
18             liberty interest in parole that flows from the relevant California
               statutes.  Biggs, 334 F.3d at 917.

19
20   Irons, 505 F.3d at 853-54.[2]

21
         _____

22       [2]  The California Supreme Court has also acknowledged that the aggravated nature of the
         commitment offense, over time, may fail to provide some evidence that the inmate remains a
23       current threat to public safety.  In re Lawrence, 44  Cal. 4th at 1218-20 & n. 20.  Additionally, a
         recent panel of the Ninth Circuit in Hayward v. Marshall, 512 F.3d 536, 546-47 (9th Cir. 2008),
24       determined that under the "unusual circumstances" of that case the unchanging factor of the
         gravity of the petitioner's commitment offense did not constitute "some evidence" supporting the
25       governor's decision to reverse a parole grant on the basis that the petitioner would pose a
         continuing danger to society.  However, on May 16, 2008, the Court of Appeals decided to rehear
26       that case en banc.  Hayward v. Marshall, 527 F.3d 797 (9th Cir. 2008).  Therefore, the panel
         decision in Hayward is no longer citable precedent.

                                                    12

B. <u>Analysis</u>

       In addressing the factors it considered in reaching its 2007 decision that petitioner

was unsuitable for parole, the Board in this case stated as follows:

       PRESIDING COMMISSIONER SHELTON:  All right, good
morning, everyone.  We are back again on the fourth Subsequent
parole Consideration Hearing matter for Michael Plunkett, CDC
number E-84816.  Everyone has returned to the room that was here
during the hearing, as well as via teleconference.  Mr. Plunkett, this
Panel has reviewed all information received, and we've relied on
the following circumstances in concluding that you are not yet
suitable for parole and you would pose an unreasonable risk of
danger to society or a threat to public safety if released.

       You are your own worst enemy, sir, with regards to your
presentation, selling yourself, and trying to show us that you have
the strength and the tools that you need to be successful on the
outside.  We're going to go through this decision and we're both
going to give you some suggestions.  I think Commissioner
Johnson even indicated – and I wrote it down – you need to sell
yourself better.  Because of that, that causes us some concerns
about how you're going to handle yourself on the outside.

       You present as a very fragile person and not very strong in
conviction.  I'm concerned as to what might happen with you if
something were to happen to your aunt or any of your support base.
What we take a look at when we talk to folks is what you've done
for yourself, not what others have done for you.  We're giving you
a one year denial.  You've got some work to do.  The bottom line
is, you haven't done any self help since you've been here, other
than AA and NA.

       I spend a lot of time at this prison and there are a lot of programs
available here.  VORG is a victim's program that's available.  It's
got a waiting list.  There are correspondence courses that you can
take.  There are volunteer programs you can belong to that give
back to the community.  There's a program called POP you may
have heard of.  We also tell folks to get books out of the library that
have to do with self help and do book reports.

       When you talked to us about being on the wait list for guitar and
piano, I applaud you for your musical goals, but what is that doing
to strengthen you as a person in your battle against substance
abuse?

       I have to tell you, you know, based on what you shared with us
today – And I believe you were telling us the truth – you've been
involved in substance abuse continuously for over 25 years.  You
mentioned your brothers today.  You have two brothers whose

lives, one is lost due to overdose and one who overdosed on – Think it was LSD, living at home with your parents.  But that didn't stop you from your substance abuse.  I understand that you've developed a support system with NA and AA inside the institution.  You need to develop the same kind of support system outside the institution.

Going to go through this decision and we're both going to give you some suggestions as to what you might work on.  First of all, we've talked about the commitment offense, and I referred to that Statement of Facts that came from the December seventh, 2006 Board report.  Obviously, there's discrepancies between your observations or your participation and what the reports and witnesses indicate.  There's still some question in our mind as to whether or not the victim was beaten on his way into the vehicle, the issue of carrying a gun when you didn't have to.

The whole bottom line is, a man's life was lost for 500 dollars.  Actually, more than one's man – more than one man's life was lost for 500 dollars, if you count you and the people that were involved with this.  But that shows how overwhelming your need for drugs and or money was at that time.  So much that you threw away, and obviously a lot of talent, based upon what we've heard about today.

The offense was carried out – you know, the choice is dispassionate or calculated or execution style manner.  I think it was carried out passionately because you were angry, you were under the influence, and you wanted your money.  You spoke to that yourself.  But it did show absolutely no regard for human suffering or human life.  You know, there's some suggestion in your narration that the shooting of this victim was accidental, that he was a willing passenger in this vehicle.

I'm not convinced that that's the case when a man leaves his house barefoot and T-shirtless, is thrown in the back of a van on his stomach with a gun pointed at his back.  If he went voluntarily, maybe he should've sat in the front seat, directed whoever was driving to the telephone booth to make the phone call.  Those are some of the issues that we're concerned about.

You have no juvenile record, which is to your advantage.  Your adult criminal record is all about drugs, all about drugs, and even after the interventions, the arrests, the jail time, nothing that was offered to you swayed your choice of behaviors.  You continued on in the substance abuse lifestyle.  You were on probation.  That didn't work.  You've been to county jail.  That didn't work.  Even you were sent to prison and you still continued to use drugs for the first four years that you were here.

And with regards to your institutional behavior, your classification score is 19, which is excellent.  That's as low as you can get.  Your

disciplinary record is incredible. It's very good. You have received no 128s and you received one 115 in July of '93, so that is excellent. Obviously it goes without saying, don't get any more 115s or 128s.

I'm going to go over your positive stuff here in just a moment, but we feel that your programming has been limited as of late. You started off as gangbusters and did achieve a lot, but it's kind of dropped off to NA and AA as self help. I think you need to get yourself involved in as many different kinds of programs as you can. Your efforts have been concentrated on work, which you have an excellent record for, and for AA and NA.

The psychiatric evaluation was done in April of 2005 by Dr. Wagner, and we're not satisfied that it gives you or us enough information. What we are doing, or what we have done, is recommend that you have a new psychological evaluation done prior to your next hearing. That'll give you an opportunity to speak to the changes, the programs you've been involved in, and get a clear assessment. It's kind of like this one says, as long as you stay substance-free and continue in AA or NA, everything will be okay.

We want you to talk with the psychiatrist and see if you can get more information in there that assesses you at a stronger – the ability to handle yourself better, I guess is what I'm trying to say. Your parole plans, it is obvious that you have community support, at least your aunt, your folks, family. The job thing is nice. It's not realistic to expect that 200 dollars a week is going to support you, and that does concern us.

You were selling drugs in your past life to support yourself. We don't want to see you go back there, but I think we both believe that you have the talent, through graphic arts and computer design, to do that. But then that goes back to, you need to go back in, like Commissioner Johnson said, and develop a resume. The Board is going to need to see a resume next time you come before it.

If there's any way that you can put together samples of your work, or even attach something different that the state allows you to attach, you know, some of your own creativity, I'm sure that you've not just done emblems for the state. You've done other things. Do some mockups of that or whatever. Show what your – where your talents lay. You do have a vocation in silkscreening, so use that to your advantage. This again goes back to selling yourself. In a year, we're going to need to also see updated letters: updated letter from your aunt, updated letter offer of employment.

I would also suggest not to put all your eggs in one basket, and if you turn up with some alternative plans – one of the things I often recommend to men who are in your position with such a heavy, heavy degree of substance abuse is to see if you can get into any

15

kind of a community transitional housing program that provides you with residence, counseling, and help with employability. And it's kind of like having a big brother that watches over you as you transfer from the institution to the streets.

I indicated to you about the PC 3042 notices, and obviously, the Butte County District Attorney's office is in opposition to your parole at this time. I do want to put on the record your successes. You did – Do want to note that you did receive your high school diploma prior to incarceration, as well as roughly 140 college credits. You also completed somewhere around 36 credits in Bible college back in '95 and '96.

Your current job assignment is as AM porter. Prior to that, at Folsom – We looked back – you had a very extensive and well respected work assignment in the sign shop. You also have a forklift certificate. You received a vocation in '95 for silkscreening. You participated in anger management in '98, Alternatives to Violence in 2000, and substance abuse class in 2000 that you talked with us about. You are currently enrolled in Arts in Corrections and you're on the wait list for a couple of different programs.

So I want to briefly summarize this, you know. Your past life was chaotic. Your adult life was chaotic. Even at the age of 35, 36, you were intensely involved in using drugs, selling drugs, and like I said, a man lost his life for it. What you need to do is light a fire under you, sir. It's time for you to get back in gear. You were working hard, involved in programs up until '95, '96, and a couple of them in the year 2000.

Specifically, get involved in some self help. Look around, talk to people. If you can't find something that you think is beneficial to you, go to the library, check out a book, and write a book report to us and tell us how that book has helped you. You know, there's the issues of victims here, and loss, and making amends, and you can do that through participating in volunteer programs. See if you can get involved with POP or VORG, correspondence courses that you can take, and usually most institutions has the – have the television programs that come on during certain times of the day.

If you have a chance, I would look into seeing if you can upgrade vocationally in some sense, where you can update your computer skills. It's been 11 years since you've had computer training. I don't know what you've been able to do along the way to spruce up your computer training.

INMATE PLUNKETT: Can I make a comment on that?

PRESIDING COMMISSIONER SHELTON: Not right now. You want me to lose my place, huh? Do a resume for your parole plans.

16

That's important.  The other thing I would suggest is, reach out.  See if you can develop some kind of sponsor in AA or NA to work with you to help transition better.  I want you to be able to tell us what your plans are, not your attorney, and that's what I talk about when I say, it's what you do that counts, not what others do for you.

I want to know that you are self sustaining.  If the world falls apart around you and all your resources go away, you need to convince the Board that you're not going to go back to selling drugs, that you have alternatives in mind and you are clear about what steps you are going to take.  Commissioner.

DEPUTY COMMISSIONER JOHNSON:  I'd reiterate everything the Commissioner has said, and cannot emphasize enough that it is dependent upon you to sell yourself.  Your attorney was giving you some advice and it appeared to me that you were reluctant to even say what she had advised you to say.  Are you on a waiting list for mill and cabinet?

INMATE PLUNKETT:  I think OST, office service training.  It's basically a computer class that teaches you the office software.

PRESIDING COMMISSIONER SHELTON:  You're on the waiting list for that?  Excellent.

DEPUTY COMMISSIONER JOHNSON:  How long?

INMATE PLUNKETT:  About a year.

PRESIDING COMMISSIONER SHELTON:  Squeaky wheel gets the grease.

DEPUTY COMMISSIONER JOHNSON:  There you go.  You know, start squeaking, because let me tell you what it looks like.  It appears that you worked hard, you know, for a bunch of years, particularly when you were at Folsom and because of your classification score and because Folsom is Folsom and this is Solano, you get transferred.  And it appears that you have accepted that as, okay, it's vacation time.  It's not vacation time.  You got to, you know, you got to make some noise.

You told us that in your parole plans, you know, the job is going to pay you 200 bucks a week and you're going to be able to stay with your aunt.  If you believe that that's sufficient for you to survive, then you have to convince us of that.

And I think that you probably could if you thought about it, but you didn't even make an effort to, you know, I mean.  Because if you come over here and put our hat on and a person has a parole plan, you know, and they're going to earn 200 bucks a week, what are

1
2
3

> you going to say, if you don't know how that 200 bucks is going to
> be used or what's going to supplement that 200 bucks. So I'm
> saying all of that to you to say, you need to, you know, get back on
> the horse and do some selling of yourself. I don't have anything
> further.

4      (Decision at 70-81.)

5              After taking into consideration the Ninth Circuit decisions in <u>Biggs</u>, <u>Sass</u>, and

6      <u>Irons</u>, and for the reasons set forth below, this court concludes that petitioner is not entitled to

7      federal habeas relief with respect to his due process challenge to the Board's May 1, 2007

8      decision denying him parole for one year. The court acknowledges that there are circumstances

9      in this case that indicate petitioner is suitable for release. However, the Board's decision that

10     petitioner was unsuitable for parole and that his release would unreasonably endanger public

11     safety was still supported by "some evidence" that bore "indicia of reliability." <u>Jancsek</u>, 833

12     F.2d at 1390. Specifically, in reaching its decision the Board relied on the nature of petitioner's

13     commitment offense, petitioner's history of drug abuse, petitioner's uncertain demeanor at the

14     hearing, petitioner's failure to become involved in sufficient prison self-help programs after his

15     transfer from Folsom Prison to his then-current institution, and parole plans which appeared to be

16     unrealistic. These factors constitute "some evidence" supporting the Board's decision that

17     petitioner was not yet suitable for release on parole in 2007. <u>Sass</u>, 469 F.3d at 1129; <u>Irons</u>, 505

18     F.3d at 665.

19             This case has not yet reached the point where a continued reliance on an

20     unchanging factor such as the circumstances of the offense in denying parole has resulted in a

21     due process violation. Accordingly, petitioner is not entitled to federal habeas relief on his claim

22     that the Board's failure to find him suitable for parole at his May 1, 2007 suitability hearing

23     /////

24     /////

25     /////

26     /////

18

1  violated his right to due process.  Sass, 461 F.3d at 1129; Irons, 505 F.3d at 664-65.[3]

2  III.  Request for Evidentiary Hearing

3          Petitioner has requested that an evidentiary hearing be conducted on his due

4  process claim.  (Pet. at 22 of 68.)  Pursuant to 28 U.S.C. § 2254(e)(2), an evidentiary hearing is

5  appropriate under the following circumstances:

6          (e)(2) If the applicant has failed to develop the factual basis of a
   claim in State court proceedings, the court shall not hold an
7          evidentiary hearing on the claim unless the applicant shows that-

8              (A) the claim relies on-

9                      (i) a new rule of constitutional law,
   made retroactive to cases on
10                     collateral review by the Supreme
   Court, that was previously
11                     unavailable; or

12                     (ii) a factual predicate that could not
   have been previously discovered
13                     through the exercise of due diligence;
   and
14

15             (B) the facts underlying the claim would be sufficient to
   establish by clear and convincing evidence that but for
16             constitutional error, no reasonable fact finder would have
   found the applicant guilty of the underlying offense[.]

17         Under this statutory scheme, a district court presented with a request for an

18 evidentiary hearing must first determine whether a factual basis exists in the record to support a

19 petitioner's claims and, if not, whether an evidentiary hearing "might be appropriate."  Baja v.

20 Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999).  See also Earp v. Ornoski, 431 F.3d 1158, 1166

21

22      [3]  In both his petition and traverse, petitioner contends that the Board failed to comply
   with state laws and regulations when it found him unsuitable for parole at the May 1, 2007
23 hearing.  Petitioner's arguments that the state courts erred in applying state law are not
   cognizable in this federal habeas corpus proceeding.  See Rivera v. Illinois, ___ U.S. ___, 129 S.
24 Ct. 1446, 1454 (2009) ("[A] mere error of state law . . . is not a denial of due process") (quoting
   Engle v. Isaac, 456 U.S. 107, 121, n. 21 (1982) and Estelle v. McGuire, 502 U.S. 62, 67, 72-73
25 (1991).  A federal habeas court may not grant the writ on the basis of errors of state law where, as
   here, the combined effect of those errors does not violate the Federal Constitution.  Lewis v.
26 Jeffers, 497 U.S. 764, 780 (1990); Pulley v. Harris, 465 U.S. 37, 41 (1984); Parle v. Runnels, 387
   F.3d 1030, 1045 (9th Cir. 2004).

1  (9th Cir. 2005); <u>Insyxiengmay v. Morgan</u>, 403 F.3d 657, 669-70 (9th Cir. 2005).  A petitioner

2  requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim

3  for relief."  <u>Earp</u>, 431 F.3d at 1167 (citing <u>Insyxiengmay</u>, 403 F.3d at 670, <u>Stankewitz v.</u>

4  <u>Woodford</u>, 365 F.3d 706, 708 (9th Cir. 2004) and <u>Phillips v. Woodford</u>, 267 F.3d 966, 973 (9th

5  Cir. 2001)).  To show that a claim is "colorable," a petitioner is "required to allege specific facts

6  which, if true, would entitle him to relief."  <u>Ortiz v. Stewart</u>, 149 F.3d 923, 934 (9th Cir. 1998)

7  (internal quotation marks and citation omitted).

8          The court concludes that no additional factual supplementation is necessary in this

9  case in order to reach the merits of petitioner's due process claim.  The facts alleged in support of

10  petitioner's claim, even if established at a hearing, would not entitle him to federal habeas relief.

11  An evidentiary hearing is not appropriate under such circumstances with respect to the due

12  process claim raised in the instant petition.  Therefore, petitioner's request for an evidentiary

13  hearing should also be denied.

14                                        CONCLUSION

15          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

16  a writ of habeas corpus be denied.

17          These findings and recommendations are submitted to the United States District

18  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

19  one days after being served with these findings and recommendations, any party may file written

20  objections with the court and serve a copy on all parties.  Such a document should be captioned

21  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

22  shall be served and filed within seven days after service of the objections.  The parties are

23  /////

24  /////

25  /////

26  /////

1   advised that failure to file objections within the specified time may waive the right to appeal the

2   District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: March 16, 2010.

4

5   _____

6   DALE A. DROZD
    UNITED STATES MAGISTRATE JUDGE

7   DAD:8:
    plunkett907.hc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26